IN THE UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION

IN RE:                          )
                                )
MARK E. LOGANBILL and           )   Case No. 11-21349-drd12
SARA D. LOGANBILL,              )
                                )
            Debtors.            )

## MEMORANDUM OPINION

Before this Court are the Motion to Dismiss or Convert Pursuant to Bankruptcy Code
Section 1208(d) (the "Motion") filed by FCS Financial ("FCS"), and the Motion to Dismiss for
Failure to Comply with the Terms of the Confirmed Plan filed by the Chapter 12 Trustee.  Also
under consideration is the Debtors' Motion for Entry and Order of Discharge and the objections
thereto filed by FCS and the Trustee.  This is a core proceeding under 28 U.S.C. §157(b)(2)(A)
and (J) over which the Court has jurisdiction pursuant to 28 U.S.C. §§1334(b), 157(a) and (b)(1).
The following constitutes my Findings of Fact and Conclusions of Law in accordance with Rule
52 of the Federal Rules of Civil Procedure, made applicable to these proceedings by Rules 7052
and 9014(c) of the Federal Rules of Bankruptcy Procedure.

## I.      FACTUAL AND PROCEDURAL BACKGROUND

Debtors Mark and Sara Loganbill owned Excel Milling, Inc., a fertilizer and fescue seed
business. As of November 2010, Debtors were indebted to FCS for various secured loans in an
approximate amount of $2.85 million.  In June 2011, shortly before filing for bankruptcy, the
Debtors created Excel Seeds, LLC ("Excel Seeds"), and operated that company until July 19,
2011, when they sold it to Mark's brother and sister-in-law, Kent and Debra Loganbill, for $1.
After the sale of Excel Seeds, the Debtors remained authorized signatories on the company's

bank account and continued to purchase, transport and process seed on behalf of Excel Seeds. Mark Loganbill held himself out as President.

On August 1, 2011, Debtors filed a Chapter 12 bankruptcy petition.  They did not disclose either their interest in Excel Seeds or the transfer of that interest in their Statement of Financial Affairs ("SOFA") or Schedules. Thereafter, Debtors sought and were granted authority to sell the assets of Excel Milling.  The assets were sold at auction on September 15, 2011.  The real estate, which included a seed mill, was purchased by Kent Loganbill.

On the date of filing bankruptcy, Debtors were signatories on six accounts at Tipton Latham Bank ("TLB") and owners of three of the accounts identified as a personal account, a farm account and a children's account.  Those three accounts had balances of $1,926.95, $7,645.11 and $6,534.31, respectively, yet only one account was disclosed in the Debtors' Schedules, and that showed a balance of negative $351. Additionally, Debtors were the owners of a Computershare account containing Walmart stock and on May 3, 2011, sold the stock for $10,241.90 and retained ownership of the proceeds.  They failed to disclose such proceeds on the Schedules filed on August 22 or September 26, 2011, but later included them on Schedules filed on October 23, 2012 as a post-petition payment.

Debtors filed a Chapter 12 Plan on November 10, 2011, to which FCS objected.  Debtors and FCS reached a settlement agreement in which FCS was treated as a secured creditor with a claim in the amount of $1,021,000 and an unsecured creditor for the remaining amount of its claim against Debtors.  The Court confirmed the Debtors' plan, as amended by the settlement agreement (the "Plan"), on January 31, 2012, which, among other things required Debtors to make monthly payments of $500 to their unsecured creditors.

During the term of the Plan and without obtaining Court approval, the Debtors personally obtained bank loans to purchase trucks which they leased to and drove for Excel Seeds. The company made the payments on the truck loans and paid for the fuel and maintenance on the trucks. The Debtors also incurred secured debt in the amount of $14,245.25 to buy a 2008 BMW and paid off this amount prior to the end of 2014. Debtors did not obtain court approval to do this.

In 2013, Debtors 2000 Freightliner truck, on which FCS had a lien, was wrecked. Debtors knew they would receive $21,017 from insurance but, without disclosing to FCS that the truck was wrecked or the amount of insurance proceeds, offered to pay FCS $13,000 for the release of the title. FCS agreed to this and released the lien. Debtors paid the remaining insurance proceeds to Excel Seeds.

FCS has filed a Motion to Dismiss or Convert pursuant to U.S.C. §1208(d) based on its contention that Debtors committed fraud in connection with the case and/or had disposable income in excess of the monthly amount paid to unsecured creditors under their Plan. Debtors deny the fraud allegations. They also contend that they had no excess disposable income and that they made all the payments as required under the Plan. They have filed a motion seeking entry of a discharge order. For the following reasons, the Court will grant FCS's motion to dismiss or convert and will convert Debtors' Chapter 12 bankruptcy proceeding to one under Chapter 7. The Court will also deny Debtors' motion for discharge.

## II.   FRAUD UNDER §1208(d)

### A.   STANDARD FOR DETERMINATION OF FRAUD

The Debtors contend that conversion or dismissal under §1208(d) requires proof of all the elements of common law fraud:  1) a representation, 2) made by a debtor, 3) which the debtor

knew was false when made, 4) that was made with the intent to deceive, 5) upon which the intended creditor actually and justifiably relied, 6) and that the creditor was damaged as a result. FCS disagrees, positing that the standard is broader than focusing solely on misrepresentations, and that establishing specific reliance and damages is not necessary.

Courts that have considered misrepresentations as a basis of fraud in this context have held that proof of specific reliance and damages with respect to the moving party is not required. *See, e.g., In re Caldwell*, 101 B.R. 728 (Bankr. D. Utah 1989). Rather, it is the damage to the bankruptcy process that is the key inquiry of §1208(d). *Id.* at 738 ("The damage in this case is the inability of the court, the Standing Trustee and the creditors to rely upon the accuracy of Caldwell's schedules."). In *In re Graven*, 936 F. 2d 378 (8th Cir. 1991), a case on which FCS relies, the Eighth Circuit found that "a clear pattern of deliberate fraud perpetrated with the intent to hinder, delay and defraud the creditors of the debtors" is sufficient to support a finding of fraud under §1208(d). In that case, the bankruptcy court based its finding of fraud on facts similar to those in this case:  the debtors' numerous transactions for insufficient or no consideration, their possession and use of the property following the transfers, their underhanded transfers to an irrevocable family trust, and their false statements submitted to the bankruptcy court. Accordingly, this Court adopts the broader view of fraud espoused by FCS and articulated by the Eighth Circuit, and concludes that reliance and damages by FCS are not necessary elements of proof in this case.[1]

### B.    FAILURE TO DISCLOSE

---

[1] The United States Supreme Court recently addressed the question of whether a misrepresentation was necessary to trigger the "actual fraud" nondischargeability provision. The court held that §523(a)(2)(A) encompasses fraudulent conveyance schemes even when those schemes do not involve a false representation. *Husky International Electronics, Inc. v. Ritz*, 136 S.Ct. 1581(2016).  If proof of a misrepresentation is not required for §523(a)(2), a narrow exception to discharge based on fraud between a specific debtor and creditor, then it is only logical to conclude that it is not required for §1208(d), a broader-based fraud committed by a debtor in connection with the case.

FCS asserts that the Debtors committed fraud by failing to disclose certain assets and transfers in their original filings and by failing to correct the omissions in subsequent filings. Each omission will be examined in more detail below.

1. General Principles

Courts addressing disclosure issues in the context of §1208(d) have applied §727(a)(4)(A) by analogy. *See, e.g., Caldwell*, 101 B.R. at 733 ("Under the doctrine of *in pari materia,* this court should consider the current case law interpretation of section 727(a)(4) in determining what conduct is proscribed by section 1208(d)."). Pursuant to §727(a)(4)(A), a debtor may be denied a discharge if the debtor knowingly and fraudulently made a false oath or account. A creditor requesting that the court deny a debtor a discharge bears the burden of proving each of the elements of the applicable claim by a preponderance of the evidence. *Floret, L.L.C. v. Sendecky (In re Sendecky)*, 283 B.R. 760, 763 (8th Cir. BAP 2002). Once the creditor meets his burden of proof, the burden shifts to the debtor to show that he did not act with intent, or that the omissions were inadvertent. *In re Hooper,* 274 B.R. 210, 214-15 (Bankr. D.S.C. 2001).

In order to deny a discharge to a debtor under this subparagraph, the plaintiff must establish that:  1) debtor knowingly and fraudulently, 2) in or in connection with the case, 3) made a false oath or account, 4) regarding a material matter. *Korte v. United States of America Internal Revenue Serv. (In re Korte)*, 262 B.R. 464, 474 (8th Cir. BAP 2001). Fraudulent intent has been characterized in various ways:  "dishonesty or bad faith," "intent to deceive or mislead," "a reckless indifference to the truth." *See, e.g., Larson*, 546 B.R. at 212;  *834 Golden Gate Lane Holdings, LLC v. Savage* (*In re Savage),* 2016 WL 856016, *11 (Bankr. N.D.Ala. March 4, 2016); *In re Pynn*, 546 B.R. 425, 431 (Bankr. C.D. Ca. 2016). Since an admission or

other direct evidence of fraudulent intent is rarely available, actual intent may be established by circumstantial evidence. *Gray v. Gray (In re Gray)*, 295 B.R. 338, 343 (Bankr. W.D. Mo. 2003).

An omission or false statement is considered material if it relates to the debtor's business transactions or estate, or concerns the discovery of assets or the existence or disposition of property. *Palatine Nat'l Bank of Palatine, Ill. v. Olson (In re Olson)*, 916 F. 2d 481, 484 (8th Cir. 1990). Put another way, an omission or misstatement that detrimentally affects administration of the estate is material. *Pynn*, 546 B.R. at 431 (citations omitted). The threshold of materiality is fairly low. *Cepelak Jr. et. al v. Sears (In re Sears)*, 246 B.R. 341, 347 (8th Cir. BAP 2000).

The proper functioning of the entire bankruptcy process is dependent upon the debtors providing complete, accurate and reliable information in the petition and other documents submitted with the filing of the case so that parties in interest may evaluate the debtor's assets and liabilities and appropriately administer the case. *In re Holden*, 542 B.R. 455, 459 (Bankr. W.D.Mo. 2015)(quoting *In re Bren*, 303 B.R. 610, 613 (8th Cir. BAP 2004)), *rev'd on other grounds*, *In re Bren*, 331 B.R. 797 (8th Cir. BAP 2005). *See also In re Larson*, 546 B.R. 198, 210 (Bankr. D. Minn. 2016)("The purpose of §727(a)(4)(A), is to make certain that those who seek the shelter of the Bankruptcy Code do not play fast and loose with their assets or with the reality of their affairs."). Dependable information should be supplied for those interested in the administration of the estate on which they can rely without the need to dig out the true facts in examinations or investigations. *In re Haynes*, 2016 WL 1425873, *5 (Bankr. S.C. April 8, 2016); *In re Cecil*, 542 B.R. 447, 454 (8th Cir. BAP 2015)(citations omitted). As the court quipped in *Boroff v. Tully*, 818 F.2d 106, 110 (1st Cir. 1987), "Neither the trustee nor the creditors should be required to engage in a laborious tug-of-war to drag the simple truth into the glare of daylight." This is especially true in the context of a Chapter 12 case. As FCS noted, full

disclosure plays an expanded role because of the higher debt ceiling than that of other consumer cases (often resulting in more complexity), and the lack of a disclosure statement and creditors' committee. *Caldwell*, 101 B.R. at 738 - 39.

2.  Bank Accounts

FCS notes that on Schedule B, the Debtors disclosed only one checking account, and that it had a balance of negative $351.  In fact, the Debtors have stipulated to the fact that they were the owners of three other accounts at TLB totaling $16,106.37:  1) a personal account, 2) a farm account, and 3) a children's account.  In addition, the Debtors were signatories on three bank accounts held in the name of three of their children.  They admit that these accounts were not disclosed but deny that such failure to disclose was intentional.

The Debtors claim to have been uncertain about the proper scheduling of the bank accounts, asserting that money placed in accounts for the benefit of their children was not theirs and that they should list account balances calculated after deducting the amount of outstanding checks.  In either case, not only was their decision incorrect, it was, as the courts have held, not theirs to make.  In the *Cecil* case, the debtor claimed that she believed she did not need to disclose certain bank accounts because she did not believe the money belonged to her (since her husband was also a signatory) or they contained very little money in them at the time of the bankruptcy filing.  The Eighth Circuit rejected those arguments:  "Moreover, questions of whether bank accounts and other assets titled in a debtor's name are, or are not, property of the estate are not questions a debtor should decide.  Rather, those questions are plainly and fundamentally issues to be determined by a trustee or the court."  *Cecil*, 542 B.R. at 455. Clearly, the funds in the accounts belonged to the Debtors unless they had established formal trusts or created accounts pursuant to legislation authorizing making of gifts to minors.  The

evidence does not indicate that the Debtors did either.  At the very least, the Debtors should have listed the children's bank accounts in response to Question 14, Property held for another person, in their SOFA.  Instead, they responded that they held none.

As noted above, the Debtors indicated a negative balance in the one bank account that they did list when the correct balance was approximately $16,000 on the petition date.  They testified that "we don't know where the negative 353 or whatever number come from," but that it was probably the result of listing the amount in their check register, deducting checks that had not cleared yet.  Tr. Jan. 5, 2016, at 61.  The Debtors' explanation falls short.  They presented no evidence to corroborate their theory that they relied solely on the amount appearing in their checkbook.  Thus, the Court is not convinced that listing the negative balance was an honest mistake as the Debtors claim.   The amount listed could only have come from Debtors.  Their attempt to blame the defective disclosure on their original counsel is unpersuasive.  Although they claim he was given information on the account balances, when they saw the draft they should have corrected it.  They didn't.  Neither did they later amend it.  Instead, as they have admitted, they paid virtually no attention to the content of their schedules and statements.

3.   Excel Seeds

Another omission is the Debtors' interest in Excel Seeds and their transfer of Excel Seeds to Kent and Debra Loganbill, Mark Loganbill's brother and sister-in-law, for $1.00.    The Debtors stipulated that they were signatories on Excel Seed's bank account from its creation in 2011 until at least February 1, 2015, yet that was not disclosed in response to Question 14 of either the original SOFA or the amended SOFA.  Likewise, the Debtors failed to disclose their interest in Excel Seeds in response to Question 18 (Name of business in which Debtor has an interest) of either the original SOFA or the Amended SOFA.  The Debtors admit that they failed

8

to disclose the transfer of Excel Seeds in their court papers, but deny that their actions were intentional.  They lay the blame on their then attorney, arguing that they informed him about the transfer, but counsel did not advise the Debtors to include it in their bankruptcy schedules.  They also attempt to justify their decision not to disclose by stating that "the entity had no capital or net assets when it was transferred."  The record indicates otherwise.  The Debtors stipulated to the fact that Excel Seeds had $4,400.22 in its TLB account on the date it was "sold."

The Debtors' claim that they were forthcoming with their attorney about their assets and transfers, but that he didn't advise them about disclosure is, in a word, weak.  While the record indicates that their attorney was aware that they had an interest in a seed business, it is unclear from the attorney's testimony whether he was fully aware of the Debtors' transfer of Excel Seeds.  What *is* clear is that it was his practice to provide his clients with blank schedules and instruct them to read them and fill them out.  Their attorney also denied under oath that he ever told the Debtors that they did not need to disclose certain information.  The advice of counsel is not a defense when the erroneous information should have been evident to the debtor.  *Pynn*, 546 B.R. at 433 (citations omitted).   As the court observed in *In re Retz,* 606 F. 3d 1189, 1199 (9th Cir. 2010):  "A debtor cannot, merely by playing ostrich and burying his head deeply enough in the sand, disclaim all responsibility for statements which he has made under oath."  It was the Debtors' responsibility, not their attorney's, to ensure that those Schedules were accurate and complete.

FCS contends that the Debtors were required to disclose not only their relationship to Excel Seeds, but the income to be derived from it, the fact that they used it as a source of funds, and their continued control of the operations after the transfer.  The Debtors respond that, at the time their plan was filed, they did not contemplate borrowing money from Excel Seeds during

their case.  Even if true (and that is not entirely clear), that fact does not negate their duty to amend their court papers to reflect the income generated by Excel Seeds and their use of that income.

4.  Walmart Stock

Yet another example of non-disclosure identified by FCS involved proceeds in the amount of $10,241.90 resulting from the sale of the Debtors' Walmart stock in May of 2011. The Debtors admit that the Walmart stock sale proceeds were not disclosed on their original Schedules, but they deny that this failure to disclose was intentional.  The sale proceeds were transferred to the Debtors' daughter within three months of the bankruptcy filing, but that transaction was not listed in response to Question 10 of the original SOFA or in the amended SOFA.  The Debtors' daughter subsequently transferred the money to Excel Seeds on June 20, 2011.  That was not disclosed, however, until the Debtors filed their Amended Schedule B on December 23, 2012.  This is problematic for two reasons.  In the first place, it was too late.  The Order Confirming Amended Chapter 12 Plan was dated January 31, 2012, nearly one year prior to the amendment.  As a result, the Trustee, the creditors and this Court were not provided accurate information on which to rely when considering plan confirmation.

Secondly, whether a subsequent amendment of the schedules cures a false statement on the original schedules depends upon the circumstances.  For example, including property in an amended petition may not excuse its omission on the original if the debtor offers no explanation for that omission, of if the amendment was filed in fear of discovery.  *See In re Green*, 268 B.R. 628, 648 (Bankr. M.d.Fla. 2001)(citations omitted).  Here, the only explanation offered by the Debtors for their failure to disclose the transfer of the Walmart stock sale proceeds was that it was unintentional.  The lack of specificity in that response, combined with the timing of the

amendment and the multiple transfers of the funds, leads this Court to conclude that their

omission constituted a false oath despite their subsequent amendment of Schedule B.

> 5.   Pattern of Recklessness

In each instance described above, the Debtors' position is that their failure to disclose

was "an oversight" and "inadvertent."   Their own testimony shows that they acted with a

reckless disregard for the truth of their filings.   Mark Loganbill testified that he did not read the

Schedules very well before he signed them, that he just assumed they were correct:

> I should have took the time to figure this out because I could figure
> it out.   Later when this problem came up, I read it and read it and
> said if I would have studied that, I could have figured out that my
> attorney did not have the correct stuff on the form.   I was negligent
> in not trying to understand it better.

Tr. Jan. 5, 2016, at 32.   Sara Loganbill echoed that when questioned about the Schedules:   "I just

assumed that they were correct.   I just glanced through it.   I did not read them.   I was working in

Jeff City 12-hour days at the lab and I was busy and I did not take the time to go over them

carefully enough, I guess."   Tr. Jan. 27, 2016, at 85.

A debtor's signature on the Petition, the Schedules of Assets and Liabilities, and SOFA,

verified and made under penalty of perjury pursuant to Rule 1008, are declarations which have

the force and effect of oaths of the kind encompassed by the discharge exception for making a

false oath.   *Holden*, 542 B.R. at 459; *Morrissy v. Dereve (In re Dereve)*, 381 B.R. 309, 334

(Bankr. N.D. Fla. 2007)("Deliberate omissions from schedules or the statement of financial

affairs may also constitute false oaths or accounts.").   In a majority of cases, a debtor's discharge

has been denied when the debtor failed to read the schedules or statement of financial affairs

prior to verifying and allowing the documents to be filed.   These filings are not perfunctory

documents that a debtor may sign in blank and then trust that the financial information he has

provided to counsel will be correctly reported in the filings. *See, e.g., In re Rice*, 452 B.R. 623, 626-27 (Bankr. E.D. Mich. 2011), *aff'd*, 478 B.R. 275, 279 (E.D. Mich. 2012); *Desiderio v. Parikh (In re Parikh)*, 456 B.R. 4, 33-34 (Bankr. E.D.N.Y. 2011); *In re Mitchell*, 102 Fed. Appx. 860, 863 (5th Cir. 2004); *Mosely v. Sims (In re Sims)*, 148 B.R. 553, 557 (Bankr. E.D. Ark. 1992). The Debtors' admissions that they should have reviewed the Schedules more thoroughly before they were filed is not sufficient to relieve them of their responsibility to provide accurate information to the Trustee, FCS and the other creditors.

What emerges from FCS' contentions and the Debtors' responses is a pattern of concealment and excuses. In practically every instance, the Debtors have admitted their failure to disclose assets; they either lay the blame on the feet of their attorney, or play the "innocent mistake" card. The Court cannot accept either of these excuses as legitimate under these facts.

A series or pattern of errors or omissions may have the effect of giving rise to an inference of intent to deceive. *Holden*, 542 B.R. at 459, citing *Bren*, 303 B.R at 614, and *Gray*, 295 B.R. at 344; *Savage*, 2016 WL 856016, at *12 ("When there is a pattern of omissions, it is logical to conclude the debtor did in fact make a false oath in connection with the case.")(citations omitted); *In re Beaudry*, 549 B.R. 576, 585 (Bankr. N.D.N.Y. 2016)("[F]raudulent intent may be inferred from a series of incorrect statements contained in the schedules.")(citations omitted). In this case, the Debtors' excuses for their omissions are simply not credible and indicate the Debtors' inattention and reckless approach to preparing their Schedules and SOFA.

C.     FRAUDULENT TRANSFERS

1. Excel Seeds

Aside from the numerous assets that were undisclosed, there were transfers made by the Debtors that FCS asserts were not disclosed properly and were fraudulent, the most significant of which was the one involving Excel Seeds.  The Debtors created Excel Seeds, LLC on June 7, 2011, and owned and operated it until July 19, 2011, when they sold the company to Mark Loganbill's brother and sister-in-law for one dollar.  This transaction occurred twelve days before the Debtors' bankruptcy filing.  The Debtors' confirmed Plan projected $19,476 annual rental income from Excel Seeds, but no other income from that entity.  The Debtors' Liquidation Analysis contained no reference to Excel Seeds.

Kent Loganbill testified that the Debtors were out of Excel Seeds and that there were no assets in the company.  There is more than sufficient evidence to refute his testimony and demonstrate that Kent Loganbill misled FCS about the Debtors' role in the creation and operation of Excel Seeds.  The record establishes that when the company was sold to Kent and Debra Loganbill, the Excel Seeds bank account showed a balance of $4,400.22.  On the petition date, that bank account contained $16,846.19.  (It is significant to note that Excel Seeds had over $210,000 in its account in the brief time between its creation date and the date it was sold.)  As subsequent events clearly demonstrated, it had significant income earning potential of which Debtors took advantage.  As of the date Excel Seeds was sold, the company had purchased at least $88,000 worth of seed and had started the process of drying it in preparation for cleaning and ultimately, resale, with the expectation of making approximately $.21 per pound. The Debtors stipulated that subsequent to the sale, they negotiated for the purchase of seed on behalf of Excel Seeds, transported the seed, and assisted in its processing at the seed mill formerly owned by Excel Milling. They also testified that Kent Loganbill knew nothing about the seed

business, and thus, relied on the Debtors to operate it and earn sufficient income to pay the rent.

The Debtors have run the business continually since it was sold.

In their defense, the Debtors claim that the transfer of Excel Seeds, in addition to all of

the income derived from the company, was disclosed to the Trustee and to FCS by their attorney

and in their monthly financial reports.  They also assert that their relationship to Excel Seeds was

not fraudulent – "Kent had ultimate control over the company and retained its profits, but in

exchange for the debtors' operation of Excel Seeds, permitted them to earn significant income as

well."[2]

Again, the evidence demonstrates that the Debtors themselves had ultimate control over

the operation of the business and its coffers after the transfer and during the bankruptcy case.

Mark Loganbill testified that there were at least 33 transactions between the Excel Seeds bank

account and the Debtors' personal bank accounts during the three years the Debtors were making

payments under their Plan, and that these transactions lacked any semblance of formality or

consistency in accounting.[3]  The fact that the Debtors freely accessed Excel Seeds' account and

the multitude of transactions reinforce this Court's inference of fraud.

---

[2] Post Hearing Brief of Sara and Mark Loganbill, Feb. 29, 2016, Doc. 205.

[3] Q.    And I think you testified to this, that if you needed money, you would just take it out of Excel
         Seeds.
    A.    Yes.

    Q.    And if Excel Seeds needed money, you would just put the money into Excel Seeds.
    A.    That's correct.

    Q.    And did that numerous times over that time period.
    A.    Yes.  We helped both companies – both of us with cash flow.  And I know the timing when Sara
         asked about doing it, Kent said as long as the account keeps a ledger of it, that it would be okay.

    Q.    Did you sign promissory notes when you did this?
    A.    No.

    Q.    Did you get approval from Kent each time you took money from Excel Seeds?
    A.    At first, but then after that, no.  ….

2.  Proceeds of Walmart Stock

Another transfer alleged to be fraudulent by FCS involved the proceeds of a sale of Walmart stock owned by the Debtors prior to their bankruptcy filing.   In May of 2011, they sold that stock for $10,241.90, and transferred the proceeds to their daughter.   Shortly thereafter, the stock proceeds were moved into Excel Seeds.   Five months after the bankruptcy filing, the money was deposited back into the Debtors' account.   These transfers were not disclosed in the original SOFA (in response to Question 10) or in any later amendments to the SOFA.   The first time the proceeds are mentioned is in Debtors' amended Schedule B filed in October, 2012, but they are erroneously listed in response to Item No. 20 as a post-petition inheritance from Mark Loganbill's father.   The Debtors admit that they did not disclose the stock proceeds in their original schedules, but state that they disclosed this asset to their attorney prior to filing their case.   Indeed, that is true, but the Debtors failed to follow-through when it came time to finalize their Schedules.   In an email to the Debtors dated August 18, 2011, their attorney instructed them to complete the missing information in the schedules, specifically, "We need information on your Wal-Mart stock on no. 13."   Debtors' Ex. 44.   It is apparent that the Debtors ignored this directive. Moreover, they failed to correct this omission and error in a subsequent amendment to their Schedules.

3.  General Principles

As stated above, a clear pattern of deliberate fraud perpetrated with the intent to hinder, delay and defraud the creditors of the debtors is sufficient to support a finding of fraud under §1208(d).   In *Graven*, the case on which FCS relies for the relevant standard, the Eighth Circuit

---

Q.    And did you ever think about getting court permission for borrowing money from Excel Seeds?
A.    No.   We looked at it as just temporary transfers….

Tr. Jan. 5, 2016, at 72-73.

concluded that this "hinder, delay and defraud" standard was properly applied by the bankruptcy

court, and noted that it is echoed in both §548(a) and the Missouri statute pertaining to fraudulent

conveyances.  Section 428.024.1(1) of the Missouri Revised Statutes states that a transfer made

by a debtor is fraudulent as to a creditor if the debtor made the transfer "[w]ith actual intent to

hinder, delay, or defraud any creditor of the debtor."  The statute also sets forth a number of

badges of fraud to consider in determining actual intent, many of which are present here.[4]

With regard to the Excel Seeds transfer, it was made to an insider (the Debtor's brother),

the Debtors retained control of the business after the transfer, the transfer was not disclosed in

the Debtors' SOFA, the value of the consideration received ($1) was not reasonably equivalent

to the true value of the company, and the transfer was made shortly before the bankruptcy filing.

---

[4] (1) The transfer or obligation was to an insider;

(2)  The debtor retained possession or control of the property transferred after the transfer;

(3)  The transfer or obligation was disclosed or concealed;

(4)  Before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;

(5)  The transfer was of substantially all the debtor's assets;

(6)  The debtor absconded;

(7)  The debtor removed or concealed assets;

(8)  The value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;

(9)  The debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;

(10)  The transfer occurred shortly before or shortly after a substantial debt was incurred; and

(11)  The debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

Mo. Rev. Stat. §428.024.2.

Nearly the same badges of fraud pertain to the sale of the Walmart stock – the proceeds were transferred to an insider (the Debtors' daughter), the transfer occurred within six months of the bankruptcy filing, the Debtors retained control of the funds since the proceeds were eventually transferred back to Excel Seeds (controlled by the Debtors), and the proceeds were not initially disclosed (and when they were eventually disclosed, they were mischaracterized as an inheritance).

Based on the record before it, the Court finds that the transactions involving the Debtors' purported sale of Excel Seeds and of the Walmart stock were conduct with the intent to hinder, delay and defraud their creditors under both §1208(d) and Missouri law.

> D.    OTHER FRAUDULENT CONDUCT

>> 1.   Insurance Fraud

Debtors owned a 2000 Freightliner (the "Truck") on which FCS held a lien.  The Truck was wrecked in 2013.  Although the Debtors knew that the insurance company was going to pay $21,017,  they deliberately did not disclose that fact to FCS nor that the Truck was involved in an accident.    Instead, Mark Loganbill wrote the following to FCS:  "I no longer wish to retain ownership of the 2000 Freightliner.  I would have the ability to pay FCS $13,000 for the release of the title, or relinquish possession to FCS for a corresponding reduction in the loan.  Let me know your wishes."  Pl. Ex. 61.  FCS agreed to release its lien for $13,000.  In the meantime, the insurance proceeds were paid to Excel Seeds.

The Debtors make no effort to explain what can only be characterized as blatant deception.  They only assert that FCS suffered no injury on account of this transaction because its claim secured by the lien on the Truck was later paid in full.  FCS counters that even if the delay in payment did not ultimately damage FCS in its capacity as a secured creditor, the

unsecured creditors were deprived of the disposable income the Debtors had to pay to FCS and TLB due to the fraud.

This Court agrees with FCS that the distribution to unsecured creditors would likely have been higher absent the fraud.  The implications of this fraud extend beyond monetary damages, however.  As the court reasoned in *Caldwell*, 101 BR at 738,  "Perhaps the real damage is to the bankruptcy process when the courts, trustee and creditors cannot rely on the Debtors being truthful in connection with financial matters under their confirmed plan."    While it may be true that the damages of FCS and the unsecured creditors may be insubstantial in a strictly monetary sense, the Debtors most certainly damaged the integrity of the bankruptcy system by lying to FCS and continuing the Debtors' pattern of dishonesty and concealment vis-`a-vis their creditors.

2.  Payment of Wages

The Debtors stipulated that on three separate occasions from December, 2012, through January, 2015, they deposited checks made payable to their children into the kids' account.  The funds came from the sale of sows which were given by the Debtors to some of their children, and then sold in the children's names.[5]

Sara Loganbill testified that the children were paid wages because they worked on the farm helping with the livestock and various chores.  Tr. Jan. 27, 2016, at 69.  She also testified that paying these wages was a regular thing that she did before the bankruptcy filing.  *Id.* at 70. Her co-Debtor, however, told a different story.  When questioned about the money given to the children, Mark Loganbill testified as follows:

> Q:  If you'd look back at Exhibit #53, the Amended Chapter 12
> Plan … under the "Annual Farming Expense," do you show any
> wages?
> A:  No.

---

[5] Joint Stipulation of Facts, Dec. 29, 2015, Doc. 185.

18

Q:  So, these were wages that you were not expecting to pay to the
kids?
A:  Right.  I was not.

Q:  But because you had money, instead of paying that money to
unsecured creditors, you paid it to the kids?
A:  Actually, I let them earn some of our living expenses.

Q:  But they hadn't gotten money in 2009?
A:  No.

Q:  Or 2010?
A:  No.

Q:  Or 2011:
A:  No.

Q:  But in 2012, since you're in the bankruptcy then, you thought
you could pay the kids?
A:  It was the year we had a profit.

Tr. Jan. 5, 2016, at 82-83.  In total, approximately $40,000 in wages was paid to the Debtors'

children during the pendency of their case.  Payment of wages to the Debtors' children is

inconsistent with the projection of expenses offered by them to support feasibility of the Plan and

to obtain its confirmation.  In addition, it is precisely the absence of a "profit" the Debtors rely

upon to claim they were not compelled to make any additional payments to their unsecured

creditors and thus entitled to a discharge.  Had the Debtors made one, they were obligated to pay

it to their unsecured creditors, not to their children.  The Court finds these transfers to be material

and fraudulent, particularly since creditors relied on the projected income and expenses (albeit

false) provided by the Debtors to evaluate the Plan and confirm it.

3.  Trade of Fescue Seed

In 2013, the Debtors traded fescue seed on which FCS had a lien for an over-the-road

tractor worth $24,022.50.  According to FCS and the Trustee, this was done in direct

contravention of the Plan provision requiring Debtors to give written notice to FCS if its collateral was being substituted or sold.  The Debtors maintain that they were unaware that FCS had a lien in their fescue seed when they engaged in the transaction, and place blame on FCS for not requesting a replacement lien in the tractor once they became aware of it. Once again, the Debtors are feigning ignorance and pointing the finger at someone other than themselves.  The Security Agreement between the Debtors and FCS dated December 21, 2007 (signed by the Debtors themselves) includes in the description of collateral "all feed, seed, fertilizer…," so FCS' lien unquestionably covered the fescue seed that the Debtors traded.  Part X of the Plan provides that "Debtors shall not sell any property which serves as collateral for any creditor without first obtaining said secured creditor's consent or, in the alternative, providing the secured creditor at least 10 days' notice in writing of the intent to sell the collateral."  Therefore, the Debtors' transaction involving the seed was in violation of the express terms of the Plan.

### 4. Prepayment of Lease

The Debtors testified that in 2014 they made an $18,492 down payment on a lease of a Case IH tractor.  The lease term was seven years.  FCS asserts that the down payment should have been spread over the life of the lease period instead, and this Court agrees.  Given the history of these Debtors, it appears that they accelerated the lease payments with the intention of keeping those funds away from their creditors.  Once again, the Debtors have attempted to manipulate the bankruptcy system to the detriment of their creditors.

### 5. Purchase of Breeding Livestock

The record reflects that as of December 31, 2014, the Debtors had calves valued at $114,000.  Mark Loganbill testified that he waited and held the most calves he had ever held for price reasons. He finally sold the calves in February of 2015.  However, the Debtors included in

their income analysis the acquisition costs associated with the cattle.   FCS contends that had the

Debtors sold their calves per normal operations, they would have had additional income during

the three-year plan period.   Likewise, if they had accounted for the costs at the time of the sale,

the Debtors' income analysis on which the Trustee and creditors relied to evaluate the Plan

would have reflected additional income.   There is sufficient evidence for this Court to infer that

the Debtors intentionally chose not to sell the calves until after the plan period expired to avoid

committing that income to the Plan.   This is one more example of the Debtors' manipulation of

the bankruptcy process through the deferral of income and acceleration of expenses.

     E.    CONCLUSION AS TO FRAUD

    The record reflects a pattern of omissions and reckless indifference on the part of the Debtors

such that fraudulent intent can be inferred under §727(a)(4)(A).  Each omission involved an asset

or transaction that pertained to the Debtors' business and significantly affected the administration

of the estate.   The Debtors' pattern of omissions, inconsistencies and falsities, together with their

failure to correct their errors through the amendment process, paints a picture of the Debtors'

mindset – one of manipulation and disregard for the bankruptcy process.   As the court stated in

the recent case of *In re Crawford*, 2016 WL 3356397, *7 (Bankr. W.D.N.C. June 9, 2016):

"Considering the totality of these circumstances, Crawford has established a course of conduct

throughout this case of playing fast and loose with her assets and sworn statements.   She

repeatedly acted recklessly regarding the truth and does not grasp the serious undertaking of

filing bankruptcy.   If all debtors conducted themselves in this manner, the bankruptcy system

would grind to a halt and become prohibitively expensive for creditors and trustees to determine

whether the information provided is true."    Taking into account all of the foregoing evidence,

the Court finds that FCS has met its burden of proving that the Debtors knowingly and

fraudulently made false oaths regarding material matters in this case. In addition, the Debtors

were involved in several transactions which bear many of the hallmarks of transfers effected with

intent to defraud creditors.

## III.   DISPOSABLE INCOME

FCS contends that Debtors had disposable income in excess of the $500 per month

amount they were required to pay to their creditors under their Plan and that Debtors' Chapter 12

bankruptcy case should be converted to a Chapter 7 or dismissed for failure to comply with 11

U.S.C. §1225.  Debtors assert that they had no excess disposable income and made all of their

required payments under the approved plan of reorganization. They have filed a motion seeking

entry of discharge under §1228 to which FCS and the Trustee have objected.  The Court held a

hearing on the motions and the parties submitted post-hearing briefs.  For the following reasons,

the Court will grant FCS's Motion, convert Debtors' Chapter 12 bankruptcy proceeding to one

under Chapter 7, and deny Debtors' motion for discharge.

### A.     STANDARD FOR DETERMINATION OF DISPOSABLE INCOME

Section §1225(b)(2) defines "disposable income" as income that is received by the debtor

and that is not reasonably necessary to be expended (A) for maintenance or support of the debtor

or a dependent of the debtor or for a domestic support obligation that first becomes payable after

the date of the filing of the petition; or (B) for the payment of expenditures necessary for the

continuation, preservation and operation of the debtor's business.

The Bankruptcy Code provides that a Chapter 12 debtor is entitled to discharge "after

completion ... of all payments under the plan." 11 U.S.C. § 1228(a). Here, Debtors' Plan required

that they pay FCS's secured claim in full with interest as required by §1125(a)(5) and pay the

unsecured claims over a 3-year period in an amount consistent with §1225(b)(1), which amount

was confirmed at $500 per month.

In §1225(b), Congress intended to provide creditors "an assurance that what can be done to protect their interests will be done. Disposable income is simply a measure of what can be done to promote fairness." *Rowley v. Yarnall,* 22 F.3d 190, 193 (8th Cir. 1994). The determination of what constitutes disposable income is a fact-intensive inquiry into whether debtor has "income which is in excess of that *reasonably* required for maintenance and continuation of [its] farming operation from one year to the next." *In re Coffman,* 90 B.R. 878, 885 (Bankr. W.D. Tenn. 1988). Chapter 12 debtors must turn over disposable income during the course of their farm operations under a plan. *See In re Kuhlman,* 118 B.R. 731 (Bankr. D.S.D. 1990). Creditors may also require a final disposable income determination at the end of the plan, prior to discharge, to ensure that debtor did not "accumulate an unreasonably large reserve of funds that would provide a windfall at the time of discharge." *In re Broken Bow Ranch, Inc.*, 33 F.3d 1005, 1008-09 (8th Cir. 1994); *In re Gage,* 159 B.R. 272, 280 (Bankr. D.S.D. 1993); *see also Rowley,* 22 F.3d at 194.

While the initial burden is on the trustee or movant to show that the debtors are not contributing all of their disposable income to the plan, the ultimate burden lies with the debtors to show that they are satisfying that obligation. *In re Hammrich*, 98 F.3d 388, 390 (8th Cir. 1996); *Kuhlman,* 118 B.R. at 738.  FCS satisfied its burden by submitting evidence, in the form of a detailed analysis of the Debtors' income, expenses, available cash and cash outlay,  that Debtors have not contributed all of their disposable income to the Plan.  Pl. Ex. 71.  The burden then shifted to the Debtors to refute this evidence and show that they did in fact pay all of their disposable income into the Plan.

Starting with the amount of disposable income FCS asserted should have been committed to Plan payments, Debtors' accountant testified as to his clients' claimed changes in expenses

23

and income and offered explanations as to why each should or should not be included in the disposable income calculation.   However, based on his testimony, before the deduction of additional personal expenses (which the Court discusses below), Debtors concede an additional $61,498.75 in disposable income that was not paid out to their unsecured creditors.   This amount alone is sufficient for the Court to deny their motion for discharge and convert the case to Chapter 7 or dismiss.   In the interest of thoroughness and clarity, the Court will address the individual items it sees as most troubling.[6]

### B.   DISPOSABLE INCOME ISSUES

#### 1.   Family Living Expenses

The amount of living expenses Debtors provided to creditors when presenting their feasibility analysis and Plan was $28,869 per year.   Debtors now claim they need to nearly double their annual living expenses and reduce their disposable income accordingly.   The Court will not allow this for the following reasons: (1) Debtors are estopped from increasing their projected expenses amount that the Court and creditors relied on in confirming the Plan; (2) Debtors testified that they had lived on that amount in the year prior to filing; and (3) Debtors never presented any evidence of actual increased expenses and the reasonableness of such expenses.

Judicial estoppel "protects the integrity of the judicial process." *Equal Emp't Opportunity Comm'n v. CRST Van Expedited, Inc.,* 679 F.3d 657, 679 (8th Cir. 2012) (citation omitted). "As the Supreme Court has explained, the doctrine of judicial estoppel 'generally prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory

---

[6] The Court also notes that it is not necessary to even address the disposable income issues since it is converting the case based on a finding of fraud, but in the interest of thoroughness it will discuss those disposable income issues that would also warrant conversion.  The Court need not discuss every issue raised but will address those that have a definitive amount or are most egregious.  Further, the disposable income issues are relevant to the pending motion for discharge and the Court's denial of such motion.

argument to prevail in another phase.' " *Id.* (quoting *New Hampshire v. Maine,* 532 U.S. 742, 749 (2001)) (quoting *Pegram v. Herdrich,* 530 U.S. 211, 227 n. 8 (2000) (internal quotation marks omitted)). Judicial estoppel "prevent[s] a party from playing 'fast and loose with the courts.' " *Monterey Development Corp. v. Lawyer's Title Ins. Corp.,* 4 F.3d 605, 609 (8th Cir.1993). "The circumstances under which judicial estoppel may appropriately be invoked are probably not reducible to any general formula or principle." *Stallings v. Hussman Corp.,* 447 F.3d 1041, 1047 (8th Cir. 2006) (quoting *New Hampshire,* 532 U.S. at 750). There are, however, certain factors that help guide a court regarding whether to exercise its discretion to apply judicial estoppel: (1) whether "a party's later position [is] clearly inconsistent with its earlier position;" (2) whether "the party has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in that later proceeding would create the perception that either the first or the second court was misled," and (3) whether "the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped." *New Hampshire*, 532 U.S. at 750–51 (internal citations and quotations omitted); *In re Knigge*, 479 B.R. 500, 507 (8th Cir. BAP 2012).

The increase of the Debtors' living expenses is improper for several reasons. First, the Debtors made a projection of their living expenses that both the Court and their creditors relied upon in finding that the Plan met the feasibility requirements, and in confirming it. If Debtors were now allowed to significantly increase their expenses and thus reduce their disposable income, it would defeat the entire purpose of presenting a feasibility analysis to the Court and creditors. Had the expense numbers now claimed been the expenses proposed in the Plan, the Plan would not have been confirmed. Judicial estoppel prevents Debtors from altering their

expenses at this stage as the Court, creditors and the Trustee all relied on the initial expense projections in accepting the proposed plan of reorganization.

Additionally, Debtor Sara Loganbill testified that the budgeted family expense was "bare bones" but that the family had lived on this amount in the year prior to filing. Tr. Jan. 27, 2016, at 117. If true, her testimony demonstrates that the adjustment the Debtors now propose is neither necessary nor reasonable.

Finally, Debtors have presented no evidence that their actual living expenses are in fact nearly double the amount that was projected. Sara Loganbill testified that they came up with an estimate that the family living expenses were between $45,000 and $48,000 a year, but did not present any evidence itemizing the increased expenses and made no attempt to show that such an increase was reasonable. As noted, the burden is on the Debtors to prove that any increase is reasonable and they have failed to meet such burden.

### 2. Wages To Children

FCS contends that the $44,343 Debtors transferred to their children during the course of the Plan was disposable income that should have instead been paid to the unsecured creditors. Debtors assert that their children worked for their family farm and legitimately earned these amounts as wages.[7] The evidence shows that Debtors had not paid their children wages in prior years. Further, this was not included in the Debtors' feasibility analysis upon which the Court and creditors relied when approving the feasibility of the Plan. In addition, the amount paid to the children was not related to a certain amount of time worked or tasks performed. It was an arbitrary figure divided by the number of children sharing in the distribution. Debtors testified that when they had extra money available they would deposit it into some of the children's

---

[7] Debtors argued at trial that the wages paid to their children were justified but they fail to address the issue in their post-trial brief which the Court presumes is a concession on the issue. However, if that is not the case, the Court will briefly address the issue.

26

accounts as wages for working for the business.  While in Chapter 12, Debtors should have paid

any such "extra money" to their unsecured creditors.  Their failure to do so indicates an attitude

of intentionally diverting disposable income rather than paying it to creditors.

### 3.    2014 Income Tax Refund

FCS contends that Debtors' 2014 income tax refund of $6,373 was disposable income

that was not paid to unsecured creditors.  Debtors claim that because the refund was received

after January 31, 2015, it was received outside the plan period and thus was not disposable

income. However, courts have found that even though the funds were not received until after

termination of the plan, they were attributable to debtors' farming operation during the plan and

were thus properly included in the disposable income calculation. *Broken Bow,* 33 F.3d at 1009;

*see also, Hammrich*, 98 F.3d at 390.   This Court agrees and finds that the 2014 income tax

refund should have been included as disposable income.

### 4.    Purchase Of BMW

On January 14, 2014, the Debtors obtained a loan, without court approval, to purchase a

2008 BMW, obligating themselves to monthly payments of $443.07.  FCS submits that Debtors'

purchase of that car was unnecessary and the amount paid on the vehicle loan was disposable

income that should have been paid to unsecured creditors.   Debtors argue the vehicle was

necessary because the other vehicles they had for Sara Loganbill to drive were unreliable or used

too much fuel.  Sara initially testified that her husband had a truck to drive and she had only a

1998 Dodge that was unreliable.  On examination by the Court, she admitted she also had a 2004

Escalade that she claimed used too much fuel.

In determining disposable income, courts should consider that a "fundamental purpose of

the disposable income provisions is to prevent large expenditures by debtors for non-essential

items which ultimately reduce the sum available to pay holders of unsecured claims." *In re Hedges,* 68 B.R. 18, 20 (Bkrtcy.E.D.Va.1986); *In re Fleshman*, 123 B.R. 842, 845 (Bankr. W.D. Mo. 1990).  The purchase of a third vehicle for Sara Loganbill to drive was not necessary. Debtors failed to obtain court approval and the explanation that this vehicle was necessary to save on fuel costs is llogical.  It is not reasonable to conclude that the fuel savings would be more than the monthly payment for the BMW, and Debtors offered no evidence to support this argument.  The $5,316 paid for the BMW is yet another amount of disposable income that Debtors intentionally chose to not pay to their unsecured creditors.

5.    Sale Of Cattle

In December 2014, the Debtors had cattle valued at $114,000.  Mark Loganbill testified that he withheld from sale the most calves he had ever held for price reasons;  that is, rather than selling them at the time he would normally sell them, he kept them longer to maximize his profits.  Eventually he sold the cattle in February 2015.  FCS contends that Debtors deferred the sale of their cattle in order to reap the benefits after the plan period expired.

Debtor submitted no evidence that he actually did receive a better price by holding the cattle to sell at a later date, but just made the assertion in conclusory fashion.  Debtors' disposable income analysis and testimony proposed to deduct the cost of the acquisition of the cattle to the detriment of creditors but allowed no benefit to creditors from the sale of the cattle. At the very least, this is further evidence of the Debtors' manipulation of their income to avoid paying all disposable income to creditors.  In the absence of any evidence, and taking into account Debtors' other conduct, the Court can infer that they delayed the sale of the cattle to avoid paying any disposable income earned from such sale to their creditors.

The Court agrees with FCS that the $114,000 value of the cattle should be included in disposable income because the Debtors would normally have sold the cattle during the plan period and the proceeds would have been included in disposable income.

6.   Excel Seeds, LLC- Alter Ego

FCS contends that Excel Seeds LLC is an alter ego of Debtors and as such, its income and property should be treated as income and property of the Debtors and included in the disposable income calculation.   Debtors deny this allegation and assert that Mark Loganbill's brother, Kent Loganbill, owned and controlled Excel Seeds and received its profits.

The alter ego doctrine is typically used when attempting to pierce a corporate veil.   It fastens liability on the individual who uses a corporation merely as an instrumentality to conduct his own personal business, and such liability arises from fraud or injustice perpetrated not on the corporation but on third persons dealing with the corporation. The corporate form may be disregarded only where equity requires the action to assist a third party.   *In re Ozark Restaurant Equipment Co.,* 816 F.2d 1222, 1225 (8th Cir.1987). State law controls the question of alter ego. *See Aquilino v. United States,* 363 U.S. 509, 513 (1960). Missouri courts have applied the doctrine in the corporate context and use a three-part test. "An individual will be deemed to be the alter ego of a corporation when: (1) the individual completely dominates and controls the finances, policy and business practice of the other corporation; (2) such control was for an improper purpose such as 'fraud or wrong, or ... unjust act in contravention of [a third parties'] legal rights;' and (3) the alter ego's control of the corporation caused injury to the third party." *Dean v. U.S.,* 987 F.Supp. 1160, 1164 (W.D. Mo. 1997)(citations omitted).[8]

---

[8] Technically, this case presents a reverse piercing issue but the analysis remains the same.  In the commonly understood sense, piercing the corporate veil is generally used by a creditor of a corporation to ignore the limited liability of the corporate form and to hold the shareholders liable for the debts of the corporation. It is based on the theory that the corporation was a sham or the "alter ego" of the shareholder or perhaps of an officer or director.

The evidence shows that Debtors owned Excel Seeds and transferred it to Mark Loganbill's brother and his wife for $1. However, they failed to disclose their interest in Excel Seeds or their transfer of the company in any SOFA filings.  By all accounts, Debtors were still involved in the business and helped operate it.   Sara Loganbill testified that she did the bookkeeping for Excel Seeds and that Mark ran the day-to-day operation because his brother didn't know anything about running the seed company.  She testified that they didn't get paid for their work other than the "future of a possible job."  Tr. Jan. 27, 2016, at 67.  She also testified that she and Mark bought trucks and leased them to Excel Seeds, but used them for their own purposes as well.

Further, Debtors testified that they borrowed from Excel Seeds and moved money from the company's accounts at will.  Beginning in 2013, Debtors began transferring money between their personal account and Excel Seeds' account for temporary cash flow and to pay bills.  Tr. Jan. 5, 2016, at 65-69.  As discussed in the fraudulent transfers section above, the Debtors testified there were at least 33 transactions between the Excel Seeds bank account and Debtors' personal bank accounts during the three-year plan period, and these transactions lacked any formality or consistency in accounting.  They testified further that no type of promissory note was created between them and Excel Seeds; Debtors did not even get approval from Kent Loganbill each time they took money from the company, nor did they ever seek court permission

---

*Saidawi v. Giovanni's Little Place, Inc.,* 987 S.W.2d 501, 504–505 (Mo.Ct.App.1999); *Mass v. Bell Atlantic Tricon Leasing Corp. (In re Mass),* 178 B.R. 626, 628–29 (M.D.Pa.1995). The creditor "pierces" the corporate veil or corporate form to place liability on the shareholders who, otherwise, would be shielded from liability by the corporate form. In a "reverse piercing" case, however, the shareholder (or creditor) attempts to have the corporate form of his own corporation disregarded for his own benefit. *See e.g., In re Elkay Industries, Inc.,* 167 B.R. 404, 410 (D.S.C.1994) (allowing shareholder-parent corporation to pierce the corporate veil of its wholly owned subsidiary corporation to recover the fraudulent transfer of assets to a third party). *In re Mar-Kay Plastics, Inc.*, 234 B.R. 473, 480 (Bankr. W.D. Mo. 1999).

to borrow money from Excel Seeds. They simply used the company's money for their personal needs. Debtors' accounting of the money transferred between themselves and Excel Seeds was inconsistent. They used money from Excel Seeds for their own personal use as well as for business purposes, and not all transfers were reported. *See* Debtors' Exs. 36-39. Debtors submitted evidence that they owed Excel Seeds $66,000 from a "loan" made to them by the company and also included a $77,000 amount that they owed Excel Seeds, but later testified that amount was incorrect. Tr. Jan. 5, 2016, at 124. Debtors stipulated that they were signatories on Excel Seed's bank account from its creation in 2011 until at least February 1, 2014, but failed to disclose that on either the original or amended SOFA. Additionally, Debtors included income from Excel Seeds on their individual tax returns. Debtors' Exs. 14-17.

Based on all of the evidence and testimony presented, it appears that Excel Seeds was an alter ego of Debtors and any income attributed to the company should have been included in the Debtors' disposable income calculations and paid to their unsecured creditors. Although Debtors may have included income received from Excel Seeds through leasing, it is not clear that amounts received in various other ways were reported and Debtors rebuffed efforts to learn the sources of that income. Again, this is an example of Debtors' intent to avoid paying all of their disposable income to their unsecured creditors and lends further support to converting the case to a Chapter 7. Further, even if all of these practices do not warrant treating Excel Seeds as the Debtors' alter ego, Debtors have the ultimate burden to account for their income and prove that they did not receive disposable income from Excel Seeds not included in their annual reports.

7.  Prepaid Tractor Lease

As noted above, Debtors entered into a seven-year lease of a Case IH tractor in 2014 and made an $18,492 down payment. FCS contends that the down payment should have been spread

over the life of the lease rather than made in a lump sum during the plan period.  Debtors offered

no explanation as to why it was necessary to make a large lump sum payment on the tractor lease

to the detriment of their creditors.  Had Debtors paid only the minimum amount that was due

under the tractor lease, an additional $15,850 would have been available as disposable income

and paid to the unsecured creditors.   This is another example of Debtors intentionally paying

disposable income to recipients other than their unsecured creditors in violation of the Plan and

the Bankruptcy Code.

C.      CONCLUSION AS TO DISPOSABLE INCOME

Under the facts and circumstances of this case and based on the evidence presented, the

Court concludes that Trustee and FCS have produced sufficient evidence that Debtors have not

applied all disposable income to the payment of their unsecured creditors under the Plan. Even

when all expenditures are allowed as reasonably necessary for the support of Debtors' family and

the continuation, preservation, and operation of Debtors' farm, and not even taking into account

the additional amounts FCS submits, Debtors concede an additional $61,498.75 in disposable

income that was not paid out to their unsecured creditors. The Court has discussed the most

obvious disposable income violations which provide more than enough evidence for the Court to

convert Debtors' Chapter 12 bankruptcy proceeding to one under Chapter 7 and deny Debtors'

motion for discharge.[9]

**IV.    LACHES DEFENSE**

The Debtors assert as a defense the doctrine of laches, that is, that FCS and the Trustee

delayed in bringing their motions to dismiss and convert such that they should be denied.  They

---

[9] The Court notes that there are other disposable income issues raised by FCS that it didn't address, most notably
Debtors' purchase of trucks and acquisition of land.  These actions raise further questions about Debtors'
manipulation of their disposable income, but the Court doesn't decide them because it has ample evidence to convert
the case and deny discharge without having to address additional  issues.

claim that FCS learned about the omitted information (*e.g.*, the additional bank accounts, the transfer of Excel Seeds, the payment of wages) through various sources including the 2004 Examinations, monthly and annual financial reports, and tax returns.  They also point to the fact that FCS waited several months after the end of the term of the Plan to file this Motion.  It is the Debtors' position, therefore, that it would be inequitable to permit FCS and the Trustee to obtain relief based upon facts of which they were aware years ago, but chose not to act on.

FCS counters that any delay was caused by the fact that FCS was not fully aware of the details of these omissions and fraudulent transactions until a later time, in large part because of the misleading information provided by the Debtors and Kent Loganbill.  FCS also contends that it is customary for the trustee in a case such as this to examine the disposable income issue at the conclusion of the plan term, so the timing of FCS' Motion is reasonable.

Laches is defined as "neglect to assert a right or claim which, taken together with lapse of time and other circumstances causing prejudice to the adverse party, operates as bar in court of equity."  Black's Law Dictionary 875 (6th ed. 1990).   The debtor bears the burden of proof and persuasion that laches should bar relief.  *In re Guerra*, 544 B.R. 707, 710 (Bankr. M.D. Fla. 2016).  As FCS aptly notes, relief in equity is granted to one who can show his own good faith; it is denied to someone who has been guilty of inequitable conduct in the very matter about which affirmative relief is sought. *Moore v. Carter*, 201 S.W.2d 923, 929 (Mo. 1947)**.**

The Debtors' laches defense lacks merit for several reasons.  First, nothing in the Plan, the confirmation order, the Bankruptcy Code or Rules required that FCS' objection be raised at an earlier time.  The Debtors' position that FCS was required to raise it before now is simply wrong.  Secondly, it was reasonable for FCS to wait to raise these issues when it did.  FCS relied on Kent Loganbill's testimony regarding the propriety of the Excel Seeds transfer, for example,

and was undoubtedly misled.  The Vice President of Risk Assets for FCS testified that  when questioned at the Rule 2004 examination (in the presence of the Debtors), Kent Loganbill stated that the Debtors were merely winding down the business and that he or one of his entities would be running it – "Mark and Sara were to be out."  Tr. Jan. 5, 2016, at 142.  Mark Loganbill was present for that testimony, but did nothing to correct it.

In terms of the disposable income issue, the Court finds no fault in FCS' position that it was necessary to see if more facts developed to enable the institution to determine the ultimate impact of the Debtors' actions.  Moreover, the FCS representative testified that he consulted with the Trustee who decided, as he normally does, to address the disposable income issue at the end of the bankruptcy case.  The Court recognizes that it is in fact routine for the Trustee to focus on that at the completion of the case, so the timing of FCS' Motion is not suspect.

Additionally, laches requires a showing of prejudice to the adverse party.  Here, the Debtors have not demonstrated that they were prejudiced by FCS' delay in filing the Motion; they continued operating their businesses and making their plan payments as scheduled.  Since the Debtors gave no notice and sought no permission prior to engaging in many of these transactions, FCS could not have objected to them before they occurred.  The Debtors have not demonstrated that they would have done something differently had FCS raised these issues earlier than it did.

Lastly, laches is an equitable defense.  It would be absurd to grant equitable relief to parties who are guilty of the inequitable conduct about which the other party complains.  There is ample evidence in this case to prove that the Debtors acted fraudulently and, therefore, the Court rejects their attempt to assert laches as a defense.

## V.    CONVERSION

Section 1208(d) gives the bankruptcy court the option of dismissing a Chapter 12 case or converting it to Chapter 7 once fraud has been shown.   It is FCS' position that the facts of this case require conversion.  This Court agrees.   The rationale articulated by the court in *Graven* applies here:  1)  bankruptcy laws are intended to protect the honest debtor, not to shield those who have attempted to defraud; 2)   small unsecured creditors may not afford to pursue the debtors if the case is dismissed while conversion will allow a trustee to pursue assets for their benefit; and 3) it defies reason that debtors can commit fraud and then dismiss and force creditors to pursue them in a different forum.   *Graven*, 101 B.R. at 112-113.   This Court concludes that conversion is the appropriate remedy as it will give the Trustee the opportunity to conduct an investigation and maximize recovery for the creditors of this estate.

## VI.    CONCLUSION

For all of these reasons, the Motion to Dismiss or Convert filed by FCS is granted, and the Debtors' Chapter 12 case is converted to Chapter 7.   The Debtors' Motion for Entry and Order of Discharge is hereby denied.

Dated this 1st day of August, 2016.          _____/s/ Dennis R. Dow_____
                                              THE HONORABLE DENNIS R. DOW
                                              UNITED STATES BANKRUPTCY JUDGE